# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JUDITH TAGGART-ERKANDER,**

    **Plaintiff,**

    **v.**                                   **Case No. 19-CV-435**

**RACINE UNIFIED SCHOOL DISTRICT, et al.,**

    **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS'
## MOTION TO DISMISS AMENDED COMPLAINT

---

Judith Taggart-Erkander, a former special education teacher for Wadewitz Elementary School in Racine, Wisconsin, sues the Racine Unified School District ("RUSD" or the "district"), Superintendent of Schools Dr. Eric Gallien, and Chief of Human Resources Julie Landry (collectively "the defendants") for violations of the First and Fourteenth Amendments, 42 U.S.C. § 1983, and state defamation law stemming from Taggart-Erkander's alleged coerced resignation from employment. The defendants move to dismiss Taggart-Erkander's amended complaint on the grounds that it fails to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the defendants' motion to dismiss is granted. Taggart-Erkander's complaint is dismissed without prejudice, with leave to refile within fourteen (14) days of the date of this decision and order.

## BACKGROUND

Taggart-Erkander alleges that she was a tenured special education teacher with the Racine Unified School District, working for over a decade at Wadewitz Elementary School

in Racine, Wisconsin. (Am. Compl. ¶¶ 2, 7, 11–13, 95, Affidavit of Judith Taggart-Erkander, Ex. 1 at ¶ 5.) During the course of her employment at Wadewitz, Taggart-Erkander received no professional conduct complaints. (*Id.* ¶ 14.)

During the 2016–2017 school year, Taggart-Erkander voiced concerns to her superiors that a student, M.M., needed "one–on–one" supervision due to his physical disabilities. (*Id.* ¶ 16.) Taggart-Erkander believed that M.M.'s Individualized Education Program, or IEP, should be amended to reflect the "one–on–one" care M.M. needed. (*Id.* ¶ 17.) Taggart-Erkander alleges that the school district had certain financial difficulties during the 2016–2017 school year and resisted instituting an IEP with "one–on–one" supervision for M.M. (*Id.* ¶ 18.) Taggart-Erkander sent an email to the school district on March 21, 2017, requesting information and expressing frustration regarding funding for special education in the district. (*Id.* ¶ 19.)

On or about February 24, 2017, the school district decided to hire an additional educational assistant to provide such "one–on–one" supervision for M.M., to begin on March 10, 2017. (*Id.* ¶¶ 22–23.) The district hired Dana Rodriguez for the job; however, Taggart-Erkander alleges that Rodriguez was unqualified for the position. (*Id.* ¶ 23.)

Taggart-Erkander alleges that she and her staff learned from the Wisconsin Circuit Court Access cite ("CCAP") that Rodriguez had restraining orders against her and a case for welfare fraud. (*Id.* ¶ 25.) She also alleges that Rodriguez talked about beating up her father, said that her cousins had restraining orders against her, and noted that her brother, who is a police officer, wanted nothing to do with her. (*Id.*) Taggart-Erkander alleges that M.M.'s mother became concerned about having Rodriguez as an assistant for her son and

was concerned that the school district was not properly screening and/or employing qualified candidates. (*Id.* ¶ 26.)

Taggart-Erkander alleges that on May 10, 2017, Rodriguez brought a stun gun and large folding knife into a classroom at Wadewitz. (*Id.* ¶ 29.) Taggart-Erkander alleges that during the school day of May 10, she had no knowledge or notice of the weapons incident. (*Id.* ¶ 34.) Rather, Taggart-Erkander states that she received a text message from two of her assistants on the evening of May 10 alerting her to the incident. (*Id.* ¶¶ 35–36.) At 7:45 a.m. on May 11, 2017, before school opened for the day, Taggart-Erkander notified school principal Chad Chapin, in person, of the suspected weapons incident. (*Id.* ¶ 37.) Taggart-Erkander's assistant Diane Hinze also notified her superiors of the incident at or about 8:22 a.m. that day. (*Id.* ¶ 38.) At the time Taggart-Erkander alerted Principal Chapin of the incident, Rodriguez had not yet entered the property or premises of Wadewitz. (*Id.* ¶ 39.)

Taggart-Erkander alleges that despite this notification, Rodriguez was allowed to board a district school bus at another school and ride it to Wadewitz. (*Id.* ¶ 40.) Taggart-Erkander alleges that Principal Chapin could have stopped Rodriguez from boarding the bus, but failed to do so. (*Id.* ¶ 41.) Both Chapin and Taggart-Erkander greeted the school bus in which Rodriguez was riding with Wadewitz students, including some special education students. (*Id.* ¶ 42.) Chapin did not prevent Rodriguez from entering the Wadewitz premises. (*Id.* ¶ 43.)

Approximately ninety minutes after receiving notice of the weapons incident and allowing Rodriguez to enter the premises of Wadewitz, Chapin called the Racine Police Department. (*Id.* ¶ 44.) Unbeknownst to Taggart-Erkander, Rodriguez again brought weapons into the classroom on May 11, hidden in her backpack. (*Id.* ¶¶ 49–50.) When

Racine Police eventually arrived at Wadewitz later that morning, Rodriguez was arrested. (*Id.* ¶ 51.) Rodriguez was later prosecuted for the illegal weapons incidents in Racine County. (*Id.* ¶ 52.)

On May 22, 2017, Taggart-Erkander received a hand-delivered correspondence from Landry, which Taggart-Erkander alleges falsely accused her of having knowledge of the weapons incident before Taggart-Erkander had actual knowledge of the events. (*Id.* ¶ 64.) Taggart-Erkander alleges that Landry made false publications to others regarding Taggart-Erkander which harmed her reputation in the community. (*Id.* ¶ 66.) Specifically, Taggart-Erkander alleges that Landry falsely accused her of not having protected the children in her care, which is the principal purpose on which Taggart-Erkander's reputation is predicated. (*Id.* ¶ 67.) On or about May 22, Taggart-Erkander's entire special education staff was either fired or suspended for failure to timely report Rodriguez for bringing weapons to Wadewitz. (*Id.* ¶ 72.)

Taggart-Erkander alleges that she was summoned to a meeting with Landry on May 22, at which time she was informed that she would be suspended for ten days without pay and would be reassigned to a different teaching assignment in a different school. (*Id.* ¶ 73.) On or about May 22, Hinze posted on her Facebook page the following post: "To all my friends at Wadewitz we all need your support, this is so wrong." (*Id.* ¶ 74.) Taggart-Erkander responded to Hinze's post with the following statement: "You have so much support. Let everyone know. This needs to hit the media." (*Id.* ¶ 76.)

Taggart-Erkander alleges that their supervisor, Heather Hojnacki, had been monitoring Hinze's Facebook page and reported the posts to her superiors, including Landry, on May 23, 2017. (*Id.* ¶ 77.) On May 24 and 25, 2017, Taggart-Erkander wrote

Landry two rebuttal letters disputing Landry's version of the May 10 weapons incident. (*Id.* ¶ 78.) On May 30, 2017, Taggart-Erkander filed a formal grievance with the Wisconsin Department of Public Instruction. (*Id.* ¶ 79.)

On June 9, 2017, Taggart-Erkander received a hand-delivered letter from Landry which read: "It has been brought to my attention that you may have engaged in inappropriate conduct." (*Id.* ¶ 80.) The June 9 letter directed Taggart-Erkander to another disciplinary meeting on June 12, 2017 with Landry. (*Id.* ¶ 81.) Both Taggart-Erkander and her husband met with Landry on June 12. (*Id.* ¶ 82.) Landry informed Taggart-Erkander that the basis of the "inappropriate conduct" was: (1) allowing M.M.'s mother in through a side door to bring her son into the school; (2) allowing M.M.'s mother to sign a clipboard when she came to the classroom; and (3) her call for media attention on Hinze's Facebook post. (*Id.* ¶ 83.)

Taggart-Erkander alleges that neither Landry nor the district ever made clear what school within the district Taggart-Erkander would be transferred to and that the June 12, 2017 meeting amounted to a choice of "resign or be prosecuted." (*Id.* ¶¶ 87–88.) Taggart-Erkander alleges that she signed an agreement to retire from the district so that she would not lose her retirement benefits; however, she felt coerced into doing so. (*Id.* ¶¶ 89–90.) Taggart-Erkander submitted her retirement notice to the school district on August 1, 2017. (*Id.* ¶ 91.) Taggart-Erkander alleges that Landry retaliated against her for exercising protected First Amendment speech, deprived her of her property right in her employment without due process of law, and defamed her reputation, making her unable to find comparable employment elsewhere. (*Id.* ¶¶ 93–95, 103–05.)

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*, the Supreme Court elaborated further on the pleadings standard, explaining that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.'" 556 U.S. 662, 678 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.* (citing *Iqbal*, 556 U.S. at 680). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *Id.* (citing *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. All factual allegations and any reasonable inferences must

be construed in the light most favorable to the nonmoving party. *Price v. Bd. of Educ. of City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

# ANALYSIS

Taggart-Erkander alleges six causes of action against the defendants: (1) violation of her right to due process under the Fourteenth Amendment; (2) deprivation of property pursuant to § 1983; (3) violation of First Amendment right to free speech; (4) retaliation for exercising right to free speech; (5) defamation and loss of reputation pursuant to § 1983; and (6) common law defamation. I will address each cause of action in turn.

*1.     Deprivation of Property Without Due Process of Law*

In Counts One and Two of the amended complaint, Taggart-Erkander alleges that she was constructively discharged from her employment without due process of law. The defendants argue that Taggart-Erkander's Fourteenth Amendment and § 1983 loss of property interest claims fail because the amended complaint does not plausibly allege a protected property interest or deprivation of process.

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. While there are both procedural and substantive components of the Due Process Clause, Taggart-Erkander only raises issues of procedural due process. (Am. Compl., Count One.) "To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process. Accordingly, a plaintiff asserting a procedural due process claim must have a protected property interest in that which [she] claims to have been denied without due process." *Khan v. Bland*, 630 F.3d

519, 527 (7th Cir. 2010) (internal quotations omitted). "Although the Fourteenth Amendment protects property rights, it does not create them. Instead, property rights 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Frey Corp. v. City of Peoria*, 735 F.3d 505, 509–10 (7th Cir. 2013) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "A protected property interest in employment can arise from a statute, regulation, municipal ordinance, or an express or implied contract." *Covell v. Menkis*, 595 F.3d 673, 675–76 (7th Cir. 2010).

To have a protectable property interest in a benefit, such as continued employment, a plaintiff must have more than an "abstract need or desire for it" and more than a "unilateral expectation of it." *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011). Instead, a plaintiff must have a "legitimate claim of entitlement to it." *Id.* In the employment context, a plaintiff generally is required to show that the terms of his employment provide for termination only "for cause" or otherwise evince "mutually explicit understandings" of continued employment. *Id.* Under Wisconsin law, "a dichotomy exists between employment 'at-will' and employment which can be terminated only 'for cause.'" *Id.* (internal citation omitted). Employment which can be terminated only "for cause" receives due process protections. *Id.*

The defendants argue Taggart-Erkander's amended complaint contains only bare legal conclusions that she was a "tenured" public school teacher. I disagree. Taggart-Erkander alleges in her amended complaint that she had a legally established property interest in her tenure as a special education teacher. (Am. Compl. at ¶ 119.) Taggart-

Erkander appends to her amended complaint the 2016–2017 Addendum to the Racine Unified School District's Guidelines for teachers. (*Id.* ¶ 32, Ex. 9, Docket # 19-9.) The guidelines provide that "[a]ll teachers will be employed on probation until the tendering of the fourth contract. Then their employment will be permanent and the teacher tenured except as provided hereinafter in this section or as otherwise provided in this handbook." (Ex. 9 at § 2.1.) The guidelines further provide that "[n]o teacher whose employment has become permanent will be refused employment, or discharged except for inefficiency, immorality, willful violation of the provisions of this handbook, inadequate teaching, failure to reasonably comply with administrative rules or policies, or for other just cause as stated in a written charge based on fact." (Ex. 9 at § 2.2.) The guidelines provide that teachers' contracts are renewed annually (Ex. 9 at § 5.2) and Taggart-Erkander alleges that she was employed by the district for over a decade (Compl. ¶ 95). Thus, Taggart-Erkander has alleged sufficient facts to show that she was tenured and that tenured teachers could only be terminated for good cause and in turn has sufficiently alleged a cognizable property interest in continued employment.

The defendants argue, however, the Taggart-Erkander has not sufficiently alleged that she was deprived of her property interest. The defendants assert that Taggart-Erkander was not terminated from her employment, but voluntarily retired. Taggart-Erkander alleges in her amended complaint that she submitted her retirement notice to the district on August 1, 2017. (Compl. ¶ 91.) However, she also alleges that she was forced into early retirement by the defendants who presented her with a choice of "resign or be prosecuted." (*Id.* ¶¶ 88–90.) Taggart-Erkander alleges that she was "constructively terminated or dismissed by RUSD without cause." (*Id.* ¶ 103.)

Three forms of job termination are potentially relevant here: outright discharge, coerced resignation, and constructive discharge. *Patterson v. Portch*, 853 F.2d 1399, 1405–06 (7th Cir. 1988). Coerced resignation and constructive discharge are treated in law as the equivalent of outright discharge. *Id.* at 1406. Coerced resignation is characterized by "the presence of a Hobson's choice in which the employee must resign or suffer severe consequences, such as facing criminal charges." *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010). Constructive discharge occurs when an employer makes employment so unbearable that an employee resigns. *Id.*

Here, Taggart-Erkander is not pursuing a theory of outright discharge. (Am. Compl. ¶ 91, Ex. 21.) Although Taggart-Erkander alleges that she was "constructively terminated," (Am. Compl. ¶ 103), she does not allege that her employer made her employment so unbearable that she resigned. Rather, Taggart-Erkander appears to be pursuing a theory of coerced resignation. She alleges that the June 12, 2017 meeting amounted to a choice of "resign or be prosecuted" (Am. Compl. ¶ 88) and argues in her brief that she was faced with the "Hobson's choice" of losing some or all of her retirement benefits or resign from the district. (Am. Compl. ¶¶ 88–89, Pl.'s Br. in Opp. at 19–20, Docket # 26.)

But the facts Taggart-Erkander alleges do not amount to the "Hobson's choice" contemplated by the Seventh Circuit. For example, in *Palka*, the plaintiff (Palka) was a Cook County Deputy Sheriff who allegedly threatened the children of the head of the Police Academy after his son was terminated from the Academy. 623 F.3d at 450. The head of the Police Academy filed a complaint with the Sheriff's Department's Office of Internal Affairs accusing Palka of making the threats. *Id.* at 451. Later that same day, in response to the complaint, Palka's supervisor and the head of Internal Affairs summoned Palka to a

meeting, confiscated his badge and firearm credentials, de-deputized him, and placed him on paid suspension. *Id.* About two months later, Palka was informed that the incident would be referred to the Cook County State's Attorney for possible criminal prosecution unless Palka voluntarily resigned as a Sheriff's Deputy. *Id.* He refused to resign. *Id.* Although the incident was discussed with the State's Attorney, no charges were filed. *Id.* Disciplinary proceedings moved forward and it was recommended that Palka be terminated. Before the final hearing was held, however, Palka was told that if he retired, "the Merit Board action would 'go away' and he would receive full retirement benefits, including his retirement badge and firearms credentials, which would permit him to obtain another job in law enforcement." *Id.* Palka accepted this offer and resigned. *Id.* Palka filed a lawsuit under § 1983 alleging that he was deprived of due process in connection with the loss of his employment. *Id.* at 452. Specifically, Palka alleged that he suffered from a coerced resignation when the defendants "forced him to choose between resigning to protect his retirement benefits or clearing himself before the Merit Board." *Id.*

The Seventh Circuit found that Palka failed to state a procedural due process claim. It stated:

> No doubt Palka was confronted with a difficult choice when the disciplinary charges were lodged against him and the Merit Board hearing loomed. He could retire with full benefits or appear before the Board and potentially be vindicated; the latter option, however, obviously risked termination and loss of his benefits if the charges were substantiated. But this is not the kind of choice that makes an otherwise voluntary resignation involuntary. The Merit Board provides adequate procedural protections to Cook County employees facing disciplinary charges, and its formal procedures were underway when Palka chose to resign. The Merit Board's disciplinary process satisfies the County's procedural due-process obligations, and the County and its officials cannot be held liable when an employee chooses not to avail himself of its protections. That Palka decided to resign rather than risk an unfavorable Merit Board decision does not make his resignation involuntary. The district court was right to dismiss his procedural due-process claim.

*Id.* at 453. Taggart-Erkander argues that her case is distinguishable from Palka's because Palka was guilty of the bad acts he was accused of while Taggart-Erkander did nothing wrong. (Pl.'s Br. at 20.) But the distinction does not turn on whether the process will ultimately vindicate the employee—the issue is the availability and fairness of the process itself.

Courts in this circuit have concluded that an employee's decision to retire instead of facing adverse employment consequences, including termination, does not make the decision involuntary. *Welter v. City of Elgin*, No. 12-CV-6837, 2013 WL 1337347, at *4 (N.D. Ill. Mar. 29, 2013). Rather, the "severe consequences" creating a "Hobson's choice" are more akin to threats of physical violence or criminal charges. *See, e.g.*, *Rao v. Gondi*, No. 14 C 66, 2015 WL 9489908, at *3 (N.D. Ill. Dec. 30, 2015) (finding complaint stated a claim for coerced resignation when plaintiff pled that he was faced with the choice of resigning or public shaming for plagiarism and a federal investigation or federal charges); *Lynd v. Bristol Kendall Fire Prot. Dist.*, No. 11 C 7014, 2012 WL 3069391, at *4 (N.D. Ill. July 26, 2012) (finding complaint sufficiently stated a claim for coerced resignation when plaintiff alleged the defendants threatened him and his family if he did not sign the resignation letters). If, however, the plaintiff has a viable alternative to resignation, i.e., an opportunity to "stand his ground," present evidence, and try to "clear his name," then he cannot say that the resignation was coerced. *Walsh v. City of Chicago*, 712 F. Supp. 1303, 1308 (N.D. Ill. 1989); *see also O'Gorman v. City of Chicago*, 848 F. Supp. 2d 853, 858 n.4 (N.D. Ill. 2012) (finding that risk of unfavorable decision at employment hearing and loss of benefits does not make resignation involuntary).

Taggart-Erkander alleges in her amended complaint that the June 12, 2017 meeting "amounted to a choice of 'resign or be prosecuted.'" (Am. Compl. ¶ 88.) Taggart-Erkander further alleges in an affidavit appended to the amended complaint that at the June 12 meeting, she was given the option of retiring, or "possibly being reassigned to another school, or of being prosecuted for inappropriate behavior and risk losing my reputation and my financial wellbeing." (Am. Compl. ¶ 7, Ex. 1 at ¶ 59, Docket # 19-1.) Taggart-Erkander's husband, who was also present at the June 12 meeting, similarly averred that the "result of the June 12, 2017 meeting was that RUSD and Julie Landry would not be transferring Judy to another school and further made clear that if Judy did not resign she would be prosecuted." (Am. Compl. ¶ 9, Ex. 3 at ¶ 10, Docket # 19-3.)

But Taggart-Erkander does not allege that the district and/or Landry had contacted or was planning to contact either state or federal authorities regarding her situation. Nor could they, as it is unclear what crime Taggart-Erkander could have been charged with. While Taggart-Erkander uses the word "prosecuted," it does not appear that she is using it to mean that she was being threatened with criminal charges. Rather, the "Hobson's choice" Taggart-Erkander allegedly faced was either resign or lose retirement benefits or perhaps either resign or be terminated (as Taggart-Erkander alleges that the offer to transfer her to another school was withdrawn at the June 12 meeting). But neither of these choices present the sort of "Hobson's choice" that turn a voluntary resignation into an involuntary one. *See Welter*, 2013 WL 1337347, at *4. And if Taggart-Erkander does not allege an involuntary resignation, then there is no deprivation of property and so no right to a hearing. *See Patterson v. Portch*, 853 F.2d 1399, 1406 (7th Cir. 1988).

But that is not the end of the analysis. Even assuming Taggart-Erkander suffered a deprivation of property, she does not sufficiently allege a lack of due process. While she generally alleges that the district failed to follow its own guidelines, specifically by failing to apply a graduated discipline process (Pl.'s Br. in Opp. at 21), the pleadings do not support this. Although on a motion to dismiss I must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, I am not obliged to ignore any facts set forth in the complaint or its attached exhibits that undermine the plaintiff's claim. *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir. 1992). The 2016–2017 Racine Unified School District's Employee Handbook provides that tenured employees may not be disciplined except for just cause and will be afforded basic due process. (Am. Compl. ¶ 31, Ex. 8 at § 3.8, Docket # 19-8.) This includes being advised of the facts constituting the alleged misconduct and an opportunity to respond before any penalty is imposed. (*Id.*) The handbook provides that the employee may be represented during the investigation and present during any investigatory interview. (*Id.*) While the district generally follows a progressive discipline policy, it specifically notes that in cases of serious misconduct, progressive discipline may not be appropriate. (*Id.*)

It is unclear how Taggart-Erkander alleges that the district violated its own policies of providing due process to tenured employees. She alleges that she received a hand-delivered correspondence on May 22, 2017 from Landry explaining the alleged violation. (Am. Compl. ¶ 64, Ex. 11, Docket # 19-11.) The letter states that a meeting was held on May 16, 2017 where Taggart-Erkander was questioned about the incident and presented her version of events. (Ex. 11.) A union representative was present with Taggart-Erkander at this meeting. (*Id.*) Taggart-Erkander further alleges that she wrote two letters to Landry on

May 24 and May 25, 2017 disputing Landry's version of events. (Am. Compl. ¶ 78, Exs. 17 and 18, Docket # 19-17 and 19-18.) She also filed a formal grievance with the Wisconsin Department of Public Instruction. (Am. Compl. ¶ 79, Ex. 19, Docket # 19-19.) Taggart-Erkander alleges that she received another letter from Landry on June 9, 2017 setting a meeting to discuss further "inappropriate conduct" (Am. Compl. ¶ 80, Ex. 20, Docket # 19-20) and the meeting was held on June 12, 2017 (Am. Compl. ¶ 82). Taggart-Erkander alleges that she was informed of the basis of the "inappropriate conduct" at the meeting. (*Id.* ¶ 83.) Subsequent to the June meeting, Taggart-Erkander, represented by counsel, came to an agreement regarding her retirement where the discipline would be removed from her file and she would receive her retirement benefits. (Am. Compl. ¶ 89, Ex. 21, Docket # 19-21.) Pre-termination, a civil servant removable only for cause is entitled to the following procedure: (1) oral or written notice of the charges, (2) an explanation of the employer's evidence, and (3) an opportunity to tell her side of the story. *Staples v. City of Milwaukee*, 142 F.3d 383, 385 (7th Cir. 1998). While Taggart-Erkander alleges a deprivation of due process, the facts contained in her complaint and its attached exhibits undermine her claim.

For these reasons, Counts One and Two of the amended complaint are dismissed.

### 2. *First Amendment Violations*

In Counts Three and Four of the Amended Complaint, Taggart-Erkander alleges violations of the First Amendment, specifically retaliation for exercising her right to free speech. Although Taggart-Erkander entitles Count Three a "facial challenge" and alleges that the defendants' actions chilled both her speech and the speech of those similarly situated, it is entirely unclear what law she alleges necessitates facial invalidation. Rather, both counts allege retaliation for protected speech, so I will address them as such.

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in protected speech. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). To assert a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must allege that: (1) she engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendants' decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

Not all speech by public employees, however, is protected by the First Amendment such that constitutional concerns are raised if a public employer retaliates in response to that speech. *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.*, 42 F.3d 403, 409 (7th Cir. 1994). As a threshold matter, the public employee must be speaking as a private citizen, not in her capacity as an employee. *Chaklos v. Stevens*, 560 F.3d 705, 711–12 (7th Cir. 2009). Also, before speech is protected, it must address a matter of public concern. *Cliff*, 42 F.3d at 409. Whether a government employee's speech addresses a matter of public concern depends upon "the content, form, and context of [the speech] as revealed by the whole record." *Gustafson v. Jones*, 290 F.3d 895, 906–07 (7th Cir. 2002) (internal citation omitted). Of the three factors, content is most important. *Id.* The "public concern" element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee. *Id.*

Putting aside the fact that Counts Three and Four fail because, as articulated above, Taggart-Erkander has not alleged that she suffered a constitutional deprivation, the amended complaint also fails to allege Taggart-Erkander engaged in protected activity. It is

slightly unclear what facts Taggart-Erkander alleges constitute the protected activity. In the amended complaint, both Counts Three and Four refer only to Taggart-Erkander's comment on Diane Hinze's Facebook post (Am. Compl. ¶¶ 121–135); whereas in her opposition brief, Taggart-Erkander argues that the email she sent on March 21, 2017 to Janice Duff at the Wisconsin Department of Public Instruction regarding funding for special education programs was the protected speech (Pl.'s Br. in Opp. at 26).

As to the Facebook post, Taggart-Erkander alleges that on May 22, 2017, Diane Hinze posted on her Facebook page the following post: "To all my friends at Wadewitz we all need your support, this is so wrong." (Am. Compl. ¶ 74, Ex. 15, Docket # 19-15.) Taggart-Erkander alleges that she responded "You have so much support. Let everyone know. This needs to hit the media." (Am. Compl. ¶ 76.) Taggart-Erkander alleges that Hinze's post was a matter of public interest in the community regarding the type of background checks conducted before hiring education assistants in the special education room, why the district hired an unqualified person, how the district spends money on special education, and why the district either suspended or terminated the entire special education staff. (Am. Compl. ¶ 75.)

Considering that the content of the alleged protected speech is the most important factor, the facts, as alleged, do not show clearly that the speech was addressing a matter of public concern. The statements on the Facebook page by both Hinze and Taggart-Erkander are vague, making no mention of the issues Taggart-Erkander argues Hinze's post was addressing. The vagueness of these statements is further evidenced by several peoples' posted responses such as: "What's going on,?!" "Not understanding but prayers for you," and "What is this about? I have heard nothing." (Ex. 15.) Given how vague the statements

are, they did not inform the public debate on any issue, much less on the specific issues Taggart-Erkander alleges the Facebook page was referring to. *See Clarke*, 574 F.3d at 381 ("The pivotal question is not the actual presence of public controversy, but whether the speech might inform the public debate on an issue of legitimate interest to the public at the time it is published.").

Even assuming, as Taggart-Erkander now argues, that her March 21, 2017 email to Janice Duff constitutes the basis of her protected speech, the claims still fail. Taggart-Erkander alleges that through the email to Duff, she made her concerns regarding the district's special education funding known to "her RUSD superior" (Am. Compl. ¶ 19) and although the email was not addressed to anyone at the Racine Unified School District, the Wisconsin Department of Public Instruction oversees both the Racine Unified School District and Wadewitz (Pl.'s Br. in Opp. at 26). Taggart-Erkander alleges, however, that the "chief protagonist" of her "demise as a veteran special education teacher" was Julie Landry. (Am. Compl. ¶ 101.) But the amended complaint does not allege that Landry was aware of this email to Duff. "A decisionmaker cannot retaliate on account of the protected activity if he is unaware of the protected activity." *Anderson v. Iacullo*, 963 F. Supp. 2d 818, 835 (N.D. Ill. 2013). For these reasons, Counts Three and Four of the amended complaint fail to state a claim and must be dismissed.

### 3. Fourteenth Amendment "Stigma Plus" Violation

In Count Five of the amended complaint, Taggart-Erkander alleges that the reasons given for her discipline were untrue and harmed her reputation and professional standing as a special education teacher, making it so she could not successfully pursue the occupation of her choice. (Am. Compl. ¶¶ 141–45.) While stigma to reputation in and of itself is not a

deprivation of liberty as defined in the Fourteenth Amendment, a stigma "plus" a tangible loss of a right or status previously recognized by law may state a claim under § 1983 for deprivation of a Fourteenth Amendment liberty interest without due process. *Santana v. Cook Cty. Bd. of Review*, 679 F.3d 614, 621 (7th Cir. 2012); *Colaizzi v. Walker*, 542 F.2d 969, 973 (7th Cir. 1976). When an employee claims that a government employer has infringed her liberty to pursue the occupation of her choice, the employee must show that: (1) she was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed, and (3) she suffered a tangible loss of other employment opportunities as a result of public disclosure. *Townsend v. Vallas*, 256 F.3d 661, 669–70 (7th Cir. 2001).

Taggart-Erkander alleges that the reasons given for her discipline were untrue, specifically, that she knowingly or indifferently exposed special education children to armed danger. (Am. Compl. ¶¶ 141–42.) Taggart-Erkander generally alleges that Landry made false publications to others about her that harmed her reputation in the community. (*Id.* ¶ 66.) She also alleges that the harm to her reputation and the media exposure (coupled with the fact she was one year away from retirement) made her unable to pursue the occupation of her choice. (*Id.* ¶ 145.) The "media exposure" Taggart-Erkander refers to consists of an article from the *Racine Journal Times* newspaper stating that the union had filed at least three grievances with the school district after several special education staff members were fired and others suspended from Wadewitz. (Am. Compl. ¶ 29, Ex. 7, Docket # 19-7.) The article described the weapons incident and named Dana Rodriguez and described her arrest and criminal charges. (*Id.*) The article further stated that the reasons for the discipline of the staff members had not been made public, but "several sources have said the one-day delay in

informing the administration is likely the reason behind the discipline to the staff members in the classroom." (*Id.*)

As to the *Racine Journal Times* article, Taggart-Erkander has not alleged that the defendants disseminated the allegedly stigmatizing comments. "The public-disclosure element requires that the defendant actually disseminate the stigmatizing comments in a way that would reach potential future employers or the community at large." *Palka*, 623 F.3d at 454. Putting aside the fact the article does not name Taggart-Erkander, it is also not clear who the "sources" are that speculated as to the reason for the staff members' discipline. Taggart-Erkander also generally alleges that Landry made false publications to others, but it is not clear who she allegedly made these false publications to. If the statements were only made internally, there is no constitutional violation. *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 (7th Cir. 1986). For these reasons, Taggart-Erkander's "stigma plus" claim fails.

### 4. State Law Defamation Claim

Count Six of the amended complaint alleges a defamation claim under Wisconsin law. Wisconsin courts have held that the Workers' Compensation Act ("WCA") provides the exclusive remedy for injuries arising out of one's employment, including defamation, that occurs at the hands of supervisors and co-workers before the employee is terminated. *Allen-Noll v. Madison Area Tech. Coll.*, No. 18-CV-216-SLC, 2018 WL 6834477, at *12 (W.D. Wis. Dec. 28, 2018) (citing *Anderson v. Hebert*, 2011 WI App 56, ¶ 11, 332 Wis. 2d 432, 439, 798 N.W.2d 275, 278). Taggart-Erkander argues that the WCA does not preempt her claim because the defamation did not arise out of an employment–related context. (Pl.'s Br. in Opp. at 29.) Specifically, she argues that because the district did not have an "after hours"

policy for contacting the administration and the defendants allege Taggart-Erkander should have taken a course of action when the school was closed for the evening, the injury did not arise out of her employment. (*Id.*) But the injury Taggart-Erkander alleges is defamation, and the question is whether the injury arises out of the employment. The fact that Taggart-Erkander allegedly performed the acts for which she was allegedly defamed "after hours" is irrelevant. The cause of her injury was allegedly the defendants making false statements against her both in writing and verbally and the false statements concerned an employment–related incident (i.e., the failure to timely report the weapons incident). (Am. Compl. ¶ 21.) Defamation at the hands of supervisors and co-workers while the employee is employed is subject to the WCA. *See Allan-Noll*, 2018 WL 6834477, at *12. For these reasons, I find Taggart-Erkander's state law defamation claim preempted by the WCA and it will accordingly be dismissed.

### 5. Leave to Amend

The Seventh Circuit instructs that when a plaintiff's complaint is dismissed under Rule 12(b)(6), the general rule is to give at least one opportunity to amend her complaint before the entire action is dismissed. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,* 786 F.3d 510, 519 (7th Cir. 2015). The court has stated that unless "it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Id.* (emphasis in original). I do not find this to be one of the rare cases where futility is clear at the outset of the case. *See id.* at 520. For these reasons, with the exception of Count Six, Taggart-Erkander will be given leave to amend her complaint. Any amended complaint must be filed within fourteen (14) days of the date of this decision and order.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion to dismiss (Docket # 23) is **GRANTED**. Plaintiff's state law defamation claim (Count Six) is **DISMISSED**. The remainder of plaintiff's amended complaint is **DISMISSED WITHOUT PREJUDICE**. Any amended complaint must be filed within **fourteen (14) days** of the date of this decision and order.

Dated at Milwaukee, Wisconsin this 27th day of August, 2019.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge